# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CYNTHIA DAVIS, )
                                       )     No. 13 CV 5204
               Plaintiff, )
                                        )
    v.                                 )     Magistrate Judge Young B. Kim
                                        )
CAROLYN W. COLVIN, Acting )
Commissioner, Social Security )
Administration, )
                                        )     January 22, 2016
               Defendant. )

## MEMORANDUM OPINION and ORDER

Cynthia Davis applied for Supplemental Security Income ("SSI") based on her claim that she is disabled by a combination of obesity, asthma, hypertension, and status post cerebral vascular accident ("CVA"). After the Commissioner of the Social Security Administration denied her application, Davis filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Davis's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed:

## Procedural History

Davis applied for SSI claiming that she became disabled on January 3, 2010, after suffering a debilitating stroke. (Administrative Record ("A.R.") 24, 153, 215.) After her application was denied initially and upon reconsideration, (id. at 24, 78-84, 90-93), Davis sought and was granted a hearing before an administrative law

judge ("ALJ"), (id. at 101-02). The ALJ held a hearing on March 26, 2012, at which Davis, Davis's friend, and a vocational expert ("VE") testified. (Id. at 40-77.) On April 16, 2012, the ALJ issued a decision finding that Davis is not disabled. (Id. at 24-33.) When the Appeals Council denied Davis's request for review, (id. at 1-6), the ALJ's denial of benefits became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Davis filed this lawsuit seeking judicial review of the Commissioner's decision, (R. 3); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 9); *see* 28 U.S.C. § 636(c).

## Facts

Davis's claim of disability is based mainly on limitations caused by a stroke she suffered on January 3, 2010, when she was 42 years old. As a result of her stroke, Davis experienced a sudden onset of "left facial droop, slurred speech, left tongue deviation, and upper extremity hemiparesis." (A.R. 350-51, 584, 589, 605-07.) The record suggests that Davis's substance abuse while suffering from hypertension likely caused the stroke. (Id. at 542, 582, 608-09.) In addition to using narcotics on a regular basis, Davis drank alcohol habitually and smoked a pack of cigarettes almost daily. (Id. at 350.) Davis has not had any significant job or source of income since 2007. (Id. at 171-75.) Shortly after her stroke Davis applied for SSI claiming that she is no longer able to work because of her status post CVA in combination with hypertension, asthma, and obesity, which she claims limit her ability to lift, reach, talk, recollect, concentrate, understand, and use both hands. (Id. at 153, 180-82, 208, 215, 603.) At her March 2012 hearing before an

ALJ, Davis presented both documentary and testimonial evidence in support of her claim for SSI.  (Id. at 40-77.)

## A.  Medical Evidence

On January 3, 2010, Davis suffered a stroke.  (A.R. 608.)  She visited the ER and was admitted for in-patient care at Silver Cross Hospital ("SCH").  (Id. at 605-08.)  To treat her conditions status post CVA, Davis underwent medical, physical, and psychological evaluations and treatments including physical therapy and medications.  (Id. at 50, 280, 350-51, 542-44, 582-602, 606-612, 629-39.)  Davis's treatment providers observed symptoms including numbness to the left side of her face and upper left extremity and a speech impediment.  (Id. at 609.)  In particular, an exam report written on the day of her stroke describes Davis's muscle tone and deep reflexes as being "normal in all extremities" with "no obvious gross deficits" in sensation.  (Id. at 350, 610.)  Moreover, her motor and peripheral strength for all extremities except her left hand was "5/5," and even her left-hand strength tested at "4/5."  (Id.)  Nevertheless, the attending physician at SCH, Dr. Ashraf Iskander, diagnosed Davis with left hemiparesis and prescribed several medications.  (Id. at 606.)

On January 5, 2010, Davis's treating neurologist, Dr. Thomas Zabiega, confirmed Dr. Iskander's diagnosis and recommended speech therapy.  (Id. at 283, 315, 351, 582, 608.)  In just a few days following her admission to SCH, Dr. Iskander noted that the "[p]atient did well and she was discharged" to enter outpatient therapy.  (Id. at 280, 603.)  At the time of her discharge, Dr. Iskander

reported that Davis had weakness in her left upper extremity with motor strength of "2 to 4/5," but otherwise had normal motor strength in all of her other extremities. (Id. at 603.)

Two days after her discharge, Davis went to see her general internist, Dr. Yatin Shah, who reported that Davis was "doing fairly well" and that she denied "difficulty ambulating or dizziness." (Id.) She also denied any loss of coordination. (Id.) Davis's main complaints after her stroke included headaches, numbness, tingling, speech problems, hypertension, an uneven smile, and a loss of function or weakness in her left arm. (Id. at 542, 544.) Dr. Shah diagnosed Davis with hypertension, CVA, asthma, and obesity for which he prescribed medications. (Id.) His follow-up examination a week later resulted in the same findings—that Davis's weakness is in the "left arm" or "left upper ext[remity]," is "better with treatment," and that she "denies a loss of coordination" and "does not have any psychiatric problems or symptoms." (Id. at 533-35.) Dr. Shah also noted that Davis continued to smoke and drink after her CVA. (E.g., id. at 308, 484.)

Three weeks after her stroke, Davis had a therapy session during which the physical therapist made extensive notes about her progress. The therapist explained that Davis had left-sided weakness, numbness in the left hand, impaired perception to light touch, and impaired memory, but she was able to follow one- to two-step commands. (Id. at 284.) She was within normal limits for sit-and-stand balance, range of motion ("ROM"), and muscle tone for both shoulders, elbows, and wrists. (Id. at 284-85.) Davis tested 5/5 for motor strength in the upper right

extremity but 3/5 in the upper left limb. (Id. at 285.) The therapist recommended that she increase her use of the left upper extremity in daily activities. (Id. at 287.) Davis's lower body functions including her gait and posture were "good," and her hips, knees, and ankles were also within normal limits. (Id. at 288.) Strength tests demonstrated "4+/5" on both the left and right lower extremities. (Id.) Based on this evaluation the therapist and Davis agreed that she did not require skilled physical therapy for the time being. (Id.) A week later, Advanced Practice Registered Nurse Linda Hushaw determined that Davis's capacity to push and pull and for gross manipulation, fine manipulation, and left-finger dexterity was diminished by 50% or more, but she did not indicate any issues with Davis's ability to stand, walk, bend, sit, stoop, or climb. (Id. at 270, 272.)

Between February and October 2010, Davis had regular visits with her treating physicians, Drs. Shah and Paramjit Sikand, and with Nurse Hushaw for physical evaluations and progress checkups. Their assessments were mainly consistent with earlier findings, noting left upper extremity weakness and reduced left-hand grip strength as well as stroke-related memory loss, but no other major limitations or symptoms. (E.g., id. at 329-31, 335, 354, 362-65, 380-82, 472, 508-13, 545-57.) Between February and April 2010, Drs. Peter Analytis and Zabiega, both neurologists, also treated Davis's "left-sided upper extremity and facial weakness" and prescribed her Aricept to "help[] with her memory." (Id. at 470.)

In July 2010 consulting clinical psychologist John Brauer submitted Davis's mental examination and evaluations report. (Id. at 412-13.) Dr. Brauer noted that

Davis's affect was "appropriate and her speech was slow, but clear, logical and sequential with no unusual content or preoccupations evident." (Id. at 413.) But he also noted that "[h]er concentration and attention appear[ed] to be poor," that her general fund of knowledge appeared impaired, and that her capacity for abstraction was poor, though her judgment appeared to be grossly appropriate. (Id.) He diagnosed Davis with moderate major depression status post CVA, but recorded no other significant disorders. (Id.)

A few days later Dr. Charles Carlton, an agency medical consultant, conducted Davis's physical examination and provided a report. (Id. at 415.) Dr. Carlton noted that Davis was a morbidly obese individual in "no acute distress" and that she was "able to rise from a sitting to a standing position without assistance," though he noted that she avoided "shifting weight onto her left leg at times." (Id. at 416.) At other times, Davis displayed "a normal reciprocal gait pattern." (Id.) It was not clear to Dr. Carlton whether Davis's cane was prescribed by a healthcare provider. (Id.) The examination also revealed "full painless [ROM] in all joints except the left wrist." (Id. at 417.) Davis had normal grip strength in the right hand, but only 1/5 in the left hand which she could not completely close. (Id.) Davis displayed 4/5 motor strength in the left shoulder and left elbow and "at least 4/5" motor strength "in the left lower limb and extremity . . . throughout." (Id.) Dr. Carlton determined that Davis did not need an assistive device, did not have any difficulty walking on her heels or getting on or off the exam table, had only "mild" difficulty with walking on her toes and squatting and rising, and had

"moderate" difficulty with tandem walking.  (Id. at 419.)  However, he noted that she had "severe" difficulty with left-hand gross and fine manipulative movements. (Id. at 419-21.)  Based on these findings, Dr. Carlton opined that Davis "appear[ed] to be suffering from residual left-sided weakness" that is "most pronounced in the left wrist and hand area," and noted that she "could be suffering from balance problems."  (Id. at 418.)  Dr. Carlton further opined that Davis has the residual functional capacity ("RFC") to walk more than 50 feet without an assistive device and to safely lift and handle up to 20 pounds using both hands.  (Id.)

In late July 2010 Davis underwent a mental RFC assessment with Russell Taylor, Ph.D., who noted no significant limitations in many of Davis's mental functions, but found moderate limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (Id. at 424-26.) Dr. Taylor also found that Davis's allegations were only "partially credible" given the "totality of the evidence."  (Id. at 448.)

The following month Dr. Francis Vincent, another agency medical consultant, provided a physical RFC assessment based on all records on file at the time, finding that Davis could occasionally lift 20 pounds, frequently lift 10 pounds, and stand and/or walk about six hours in an eight-hour workday, but that she was limited in her upper extremities based on a residual weakness in the left hand which she could not use more than occasionally.  (Id. at 429.)  Dr. Vincent also noted limitations on climbing as well as reaching, handling, and fingering with her left arm and hand.  (Id. at 429-32.)  He also found Davis's allegations only "partially

credible" because according to a July 2010 record Davis could use both hands to lift up to 20 pounds, and despite her allegations regarding "difficulty walking at the consultative exam[,] she inconsistently used her cane." (Id. at 435.) In October 2010 agency medical consultants Dr. Lenore Gonzalez and Kirk Boyenga Ph.D. generally affirmed the RFC assessments of Drs. Taylor and Vincent. (Id. at 455.)

Dr. Shah examined Davis in February 2011 and described symptoms of "weakness [in the] left upper ext[remity] with left facial palsy" and chronic hypertension. (Id. at 530-32.) In March 2011 Dr. Shah noted that Davis suffered a fall a month prior and experienced knee pain, arthralgia (pain in a joint), and joint stiffness and tenderness, but no joint redness, swelling, or warmth. (Id. at 505-06.) He also noted a limited ROM, pain, and tenderness in her right knee and medial joint line, but observed no issues with her walking. (Id.) Dr. Shah injected Kenalog lidocaine into her right knee and recommended strengthening exercises. (Id. at 506.)

In June 2011 Dr. Zabiega sent a cautionary notice to Davis advising her that she had not been showing up for her appointments for over a year since her April 2010 session despite a number of requests by the doctor to follow up. (Id. at 469.) He warned that if there were any further "no-shows," Davis would be discharged from his care. (Id.) Nonetheless, Dr. Zabiega opined in February 2012 in a two-sentence note that Davis "is totally disabled due to left hemiparesis and memory loss secondary to multiple strokes." (Id. at 467.)

In October 2011 Davis sprained her lower back at home from a fall, causing her pain which intensified with physical activity. (Id. at 489, 539-40.) Despite those complaints, Davis's lower spine x-ray films were normal. (Id. at 489-90, 539-40.) In November 2011 Davis again visited Nurse Hushaw for a follow-up and complained of right lower quadrant tenderness, sharp pain, and "left side weakness from [the 2010] CVA." (Id. at 486.) Hushaw recommended a healthy diet and physical therapy. (Id. at 487-88.) The following month Hushaw completed a medical evaluation form describing Davis's conditions, including asthma, limited ROM, low back pain, right knee pain, joint stiffness, "no use of left side due to CVA," assisted ambulation using a cane, and esophageal reflux. (Id. at 460-62.) Hushaw reported that Davis has no more than 20% reduction in her capacity to stand, walk, bend, stoop, sit, turn, push, or pull, but more than 50% capacity reduction in her left-finger dexterity. (Id. at 462.) She also opined that Davis has full capacity to speak, travel, and use her right fingers. (Id.) When asked to indicate Davis's capacity to lift, Hushaw noted that Davis could not use her left side and was undergoing physical therapy to improve her left-sided weakness. (Id.) Hushaw noted no mental impairments. (Id.)

In her January 2012 notes Hushaw wrote that she observed minimal improvement in Davis's left-sided weakness, hypertension, backache, and muscle weakness, (id. at 480-81), and recommended "exercise (such as walking) 30 minutes per day, most days of week," (id. at 481-82). Two months later Hushaw described

Davis as having left-arm weakness with a very limited ROM, an inability to grasp objects with her left hand, and left upper extremity strength of 1/5.  (Id. at 477-78.)

## B.    Hearing Testimony

At her hearing before the ALJ, Davis testified that she suffers from numerous problems as a result of her stroke, including face disfigurement, a speech impairment, memory loss, susceptibility to falls, and left-sided weakness.  (A.R. 48-49, 51.)  Davis admitted to past substance abuse problems, including drugs and alcohol, and to smoking before her first stroke, but firmly denied using drugs and alcohol after her stroke.  (Id. at 52.)  To improve her condition after her stroke, Davis attended speech therapy, which "helped quite a bit" and allowed her to smile and speak clearly at the ALJ hearing.  (Id. at 50.)  She also took prescribed medications and attended physical therapy, which she said "did not help much." (Id.)  Part of Davis's therapy also included playing memory card games to help restore her memory functions.  (Id. at 51.)  Davis testified that she attended all scheduled therapy sessions as well as her medical examinations with a neurologist every four months without missing an appointment.  (Id. at 52, 56.)

Davis also testified about her asthmatic condition for which she carries two inhalers and takes breathing treatments three to four times a day.  (Id. at 52-53.) She also takes medications for headaches, blood pressure, muscle relaxation, back pain, leg pain, and knee pain.  For her memory problems, Davis had been prescribed Aricept, but she claimed she stopped taking it because she could not afford it.  (Id. at 56.)  She added that her doctor's free samples of Aricept did not

help because they gave her headaches. (Id. at 57.) She also complained of numbness on the left side, both in her hand and foot. (Id. at 60.) She said her entire left hand is numb, she cannot make a fist, and she can only partially lift her left arm. (Id.) Davis also testified that she experienced two bad falls around October 2011—the first hurting her knee and the second hurting her back. (Id. at 54.) Davis explained that after these falls, her doctor instructed her to use a cane "all the time," even though she had already been using a cane on occasion. (Id. at 49, 55, 62.) Davis also testified that her first fall was caused by a second stroke. (Id. at 55.)

Because of her physical condition, Davis said she cannot "do a lot of stuff" except at times play with her kids and watch them, but mainly she "just sit[s] around." (Id. at 57.) Davis also has at least one of her sisters come by to help with bathing, cooking, grocery shopping, and doing the laundry. (Id. at 58.) Davis added that she can make a sandwich using her right hand. (Id. at 59.) When her children are at school, she just watches television. (Id.) She also feels depressed "all day" because after her stroke, she cannot read or remember as well as she used to. (Id. at 61.)

Davis's friend, Regina Williams, also testified at the hearing. According to Williams, Davis's sisters help with chores because Davis has difficulties with bathing, driving, grocery shopping, cooking, and doing the laundry. (Id. at 63-65.) Williams added that Davis has trouble maintaining balance on her feet. (Id. at 65.) She also testified that Davis no longer uses drugs or alcohol. (Id.)

**C.     Vocational Expert's Hearing Testimony**

The ALJ called a VE to testify regarding the types of jobs a person with certain hypothetical limitations would be able to perform.  The ALJ first asked the VE to assume that the hypothetical person was of Davis's age, education, and vocational background, with restrictions to light work and the following limitations: no climbing ladders, ropes, or scaffolding; no exposure to heights or hazards; and no fingering with the non-dominant left upper extremity.  (A.R. 68.)  The VE testified that such an individual can work as a sales attendant, housekeeping cleaner, and coin machine collector.  (Id.)  The ALJ then asked the VE to consider additional limitations including no driving and use of her non-dominant left upper extremity only as an assist.  (Id. at 69.)  The VE answered that such additional limitations would eliminate the coin machine collector job but would permit her to perform the sales attendant and housekeeping cleaner job so long as "reaching" with the non-dominant left upper extremity could be done "at least frequently."  (Id. at 69-70.) The VE explained that usher, counter clerk, and furniture rental consultant jobs were also available so long as the non-dominant left upper extremity could provide an "assist."  (Id. at 72.)  The VE further explained that the term "assist" is best understood as the non-dominant limb acting as a stabilizing force, such as getting under a box to lift it, or using it to guide something, even if not grasping or fingering any objects.  (Id. at 71.)  The VE stated that there were no light jobs available for a "one armed individual" who could not use one upper extremity even for an assist.  (Id.)

Next, the ALJ added to the hypothetical "mild restrictions in activities of daily living; mild restrictions in social functioning; and moderate restrictions in concentration, persistence, or pace translating those to the following work related limitations: simple instructions; routine tasks; and simple work related decisions." (Id. at 72.) The VE answered that adding those limitations to the prior hypotheticals would have no effect on the number of jobs available. (Id. at 73.) Davis's representative asked the VE to consider an additional restriction requiring the hypothetical person to carry a cane with her right hand at all times to prevent her from falling. (Id. at 75.) The VE answered that "if you impair the left upper extremity and then you add the cane to the right upper extremity, then you have the inability to carry anything, really." Accordingly, the VE testified that such a person "would not be a useful employee." (Id.)

## D.     The ALJ's Decision

On April 16, 2012, the ALJ issued a decision finding that Davis is not entitled to SSI. (A.R. 24-33.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 416.920(a)(4); *Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ found at step one that Davis has not engaged in any substantial gainful activity since her application for benefits, (A.R. 26). At step two the ALJ found that Davis suffers from obesity, asthma, hypertension, and status post January 2010 CVA and that these are severe impairments. (Id.) At step three the ALJ found that none of Davis's impairments are of listings-level severity, either individually or in combination. (Id. at 27.) Before turning to step four, the ALJ

determined that Davis has the RFC to perform light work. (Id. at 28-32.) At step four the ALJ found that Davis does not have any past relevant work. (Id. at 32.) Then at step five, the ALJ concluded that Davis is able to perform jobs that exist in significant numbers in the national economy. (Id.) Accordingly, the ALJ found that Davis is not disabled and denied her application for SSI. (Id. at 33.)

## Analysis

In challenging the ALJ's decision, Davis argues that the ALJ's RFC determination is not supported by substantial evidence because, according to her, the ALJ failed to account for Davis's left-leg weakness and standing limitations even though she found that these limitations were well supported by Davis's testimony, treating sources, and the consultative examiners' findings. (R. 22, Pl.'s Mem. at 8-9.) Davis also argues that the ALJ ignored or selectively addressed the evidence, mischaracterized the evidence she did consider, and failed to consider the impact of her obesity in combination with her other impairments. (Id. at 9-12.) The government counters that the ALJ properly provided a logical bridge between the evidence and her conclusions, considered the medical evidence as a whole, and provided a decision that is supported by substantial evidence. (R. 27, Govt.'s Mem. at 1-5.)

This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (internal quotation omitted). Under that standard, the court will not substitute its judgment

for the ALJ's, reconsider evidence, or reweigh the claimant's credibility. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence" and will ensure that the ALJ built a "logical bridge from the evidence" to the conclusion. *Minnick*, 775 F.3d at 935 (internal quotations and citations omitted).

## A.    Left-Sided Weakness

Davis lodges several complaints about the ALJ's decision based on her left-sided weakness. First, Davis charges that the ALJ cherry-picked favorable records when assessing Davis's left-sided weakness. Davis argues that "the ALJ only selectively addressed the evidence of record," turning a blind eye to the evidence supporting Davis's lower extremity weakness and largely focusing only on the records that support her conclusion. (R. 22, Pl.'s Mem. at 10.) Davis argues that if the ALJ had considered all the evidence regarding her left upper *and* lower side weakness, including the consultative examiner's findings in support of her limitations, the ALJ would have concluded that she is not capable of any work. (Id. at 9.) Davis claims that her generalized "left-sided hemiparesis" is supported by several medical records, including Dr. Shah's August 2011 note, Dr. Zabiega's February 2012 letter, and Nurse Hushaw's March 2012 note. (Id.) In particular, Davis relies on a series of documents that describe routine visits with Hushaw, who simply identified Davis's "left side weakness" without any detail. Davis argues that

such records show generalized weakness in the entire left side of her body, including her left leg. (A.R. 478, 480-81, 484, 486-87, 496.)

An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, it is also true that "an ALJ need not mention every piece of evidence, so long as [she] builds a logical bridge from the evidence to [her] conclusion." *Id.* (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). Here, the ALJ may not have explained every scrap of the record, but she created a logical bridge between the relevant evidence and her RFC determination to properly support her conclusions. For instance, the ALJ explained that she reviewed the pertinent "treating source records," but determined that such records refute the existence of lower extremity weakness based on the lack of "difficulty with ambulation," lack of "left lower extremity weakness," lack of "treatment with left lower extremity," and a gait with full control of bodily movements and coordination. (A.R. 29.) In addition, the ALJ specifically considered and referenced Nurse Hushaw's notes, but determined that they do not support limitations beyond those set forth in the RFC. (Id.)

Davis also argues that the ALJ overlooked treating physicians' notes, namely "Dr. Shah's 2011 note" and Dr. Zabiega's February 2012 letter. (R. 22, Pl.'s Mem. at 10.) However, Dr. Shah's 2011 note is not a treatment note signed by Dr. Shah, but in fact is a self-report prepared by Davis for her exemptions from community service

obligations. (A.R. 474-75.) The ALJ made clear that in reaching her RFC determination she had "taken into account [Davis's] subjective complaints" and "considered all of [Davis's] impairments, both individually and in combination," but that she did not find Davis's "testimony regarding the severity or frequency of her symptoms to be fully credible or supportive of any greater limitations or restrictions" than the ones she included in her RFC assessment. (Id. at 32.) Accordingly, Davis's argument that the ALJ ignored Dr. Shah's 2011 note is not accurate.

Similarly, the ALJ specifically addressed Dr. Zabiega's February 2012 letter in her decision. (Id. at 31.) She explained, "I do not give any weight to the February 2012 opinion of the claimant's neurologist" because the record shows that prior to drafting this letter, Davis had missed "so many appointments" with Dr. Zabiega in 2010 and 2011 that Dr. Zabiega had repeatedly warned her that she would be dropped from his care for further no-shows. (Id.) The ALJ further explained that "[t]he neurologist's February 2012 opinion is conclusive on an issue reserved for the Commissioner, and could only be based on [Davis's] subjective reports at her appointment in January 2012[.]" (Id.) She also took issue with the timing of Davis's visit and found that the "January 2012 appointment suggests that it was more of an attempt to generate documentation for her upcoming hearing and less of an effort to obtain genuine treatment." (Id.) As she points out, the entirety of Dr. Zabiega's note says: "Cynthia Davis . . . is totally disabled due to left hemiparesis and memory loss secondary to multiple strokes." (Id. at 467.) An ALJ

is not bound by a doctor's assessment of disability because that issue is reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1); SSR 96–5p, 1996 WL 374183, at *2 (July 2, 1996); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work."). Because the ALJ reviewed and considered Dr. Zabiega's February 2012 note and reasonably explained why she discounted its merits, she built the requisite logical bridge between the evidence and her determination. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

Davis also maintains that the ALJ should have explicitly considered the role she says her residual weakness played in her reported falls in March 2011 and October 2011 and should have included RFC limitations related to her instability. (R. 22, Pl.'s Mem. at 10.) But the ALJ considered multiple accounts of Davis's use of a cane and difficulty walking. For example, the ALJ referenced Davis's testimony during the hearing that "she needs to use a cane when she walks," but found that Davis "retains the ability to perform light work" because the ALJ found her "allegations of disabling limitations" not credible. (A.R. 28-29.) The ALJ's decision to discredit evidence based on credibility is not tantamount to ignoring evidence altogether or cherry-picking. *See Denton*, 596 F.3d at 425; *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Here, the ALJ confronted contradictory evidence and explained why it was rejected. *See Moore*, 743 F.3d at 1123. That is all that the ALJ was required to do.

Second, Davis argues that the ALJ erred in discrediting her testimony regarding her left-sided weakness and cane use, arguing that if she had properly credited those symptoms she would have had to include the corresponding limitations in the RFC. This court's review of the ALJ's credibility determination is particularly deferential, allowing reversal only where the analysis is "patently wrong." *See Schomas*, 732 F.3d at 708. Here, the ALJ explained that she found Davis's allegation that "she had to use a cane for ambulation following her st[r]oke" during the July 2010 consultative exam with Dr. Carlton and the January 2012 ALJ hearing inconsistent with the treating source records that documented Davis's affirmative denial of "difficulty with ambulation and left lower extremity weakness." (A.R. 29.) In addition to her inconsistent reports, the ALJ also cited as factors detracting from Davis's credibility her repeated misrepresentations concerning her use of alcohol after the CVA, her testimony that she never missed an appointment when in fact the record indicates she had missed numerous appointments with her neurologist in 2010 and 2011, her testimony that she stopped taking a medication because she could not afford it despite the availability of free samples from her doctor, and conflicts between the records of her missing physical therapy and her testimony that she never missed any of her sessions. (Id.) In her briefs Davis neither challenges these reasons nor develops an argument challenging the ALJ's credibility determination. But these reasons amply explain why the ALJ declined to add to the RFC additional limitations related to her stability and weakness and satisfy the court that her credibility analysis is not

patently wrong. *See Miller v. Colvin*, No. 12 CV 50440, 2015 WL 1915658, at *5-6 (N.D. Ill. Apr. 27, 2015).

Moreover, the ALJ cites to substantial evidence in her RFC analysis showing that Davis's weakness was in the left upper extremity, rather than the lower extremity. (A.R. 287, 351, 470, 533-35, 603, 608.) The record shows that Davis's motor strength was "2 to 4/5" in the upper left extremity and "5/5" in the lower extremities. (Id. at 417, 603.) Her gait and posture were "good" with no observable issues with her balancing, single leg stance with either leg, or the ability to change positions from supine to sit to stand. (Id. at 288.) On numerous occasions Davis denied difficulty with coordination, weakness, or ambulation. (E.g., id. at 329-31, 335, 354, 362-65, 380-82, 472, 508-13, 545-57.) In fact, a record to which both the ALJ and Davis refer highlights Davis's weakness as a limited ROM and reduced strength in Davis's left arm or left upper extremity. (Id. at 478.) Also, a November 2011 record referenced by both Davis and the ALJ recommends that Davis engage in "at least 30 minutes of exercise 3-5 days per week" and "[e]ngage in aerobic exercise such as swimming, running, bicycling, dancing, and walking." (Id. at 484-85.) As explained in the ALJ's opinion, Davis's contention that she suffered left-leg weakness is not supported by the cited medical records. Furthermore, the government makes a valid point that Davis fails to point to a single medical record that brings together her susceptibility to falls and her alleged post-stroke lower extremity weakness except for her subjective complaints, which the ALJ found to be not wholly credible. (See R. 27, Govt.'s Mem. at 3.)

The court acknowledges that there is a document in the record that describes "[l]eft sided weakness in bilateral upper and lower extremities," (A.R. 500), but the court cannot remand on this basis alone, especially in light of the substantial evidence supporting the ALJ's determination, *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Although Davis dissects pieces of the record that can be construed in her favor, the ALJ is charged with weighing that evidence, *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004), and she need not mention every piece of evidence in the record for her decision to survive judicial review, *see Denton*, 596 F.3d at 425. More importantly, Davis's argument rests on the kind of cherry-picking of evidence that she seeks to hold against the ALJ. "If an ALJ may not cherry pick medical records in an attempt to highlight only the good days, then a claimant cannot cherry pick to only highlight the bad days." *Miller*, 2015 WL 1915658, at *6. Here, the ALJ provided a "logical bridge" between the evidence and her RFC determination, *see Jones*, 623 F.3d at 1160, by adequately explaining that she had reviewed all the relevant evidence of record, had found that the record did not support Davis's allegations of left-leg weakness, had discredited Davis's credibility based on her inconsistent statements, and had weighed different medical opinions based on their merits in light of the Social Security rules and regulations. (A.R. 28-32.) Accordingly, the court defers to the ALJ's decision because it is supported by substantial evidence and is not a product of selective review of the record. *See Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990).

Third, Davis contends that the ALJ mischaracterized the evidence relating to her leg weakness by failing to appreciate an important distinction between difficulty walking and leg weakness. (R. 22, Pl.'s Mem. at 10.) According to Davis, the ALJ stated in her decision that Davis had "specifically denied difficulty with ambulation and left lower extremity weakness," when in fact, she had never denied left lower-leg weakness. (Id. at 11.) Even if the disputed statement were indeed a mischaracterization of the evidence, this particular error is harmless because the crux of Davis's argument is a distinction based only on form over substance, especially in light of the substantial evidence in support of the ALJ's analysis concerning her ability to stand and walk. (E.g., id. at 270, 288, 417-19, 429); *see e.g.*, *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision."); *Rounds v. Astrue*, 549 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008) (finding that an error is harmless if it does not affect the outcome of the case). For example, the record provides that Davis consistently denied "difficulty ambulating or dizziness," "weakness," and "loss of coordination," (e.g., A.R. 523, 530), and a medical evaluation further shows that Davis was not limited in standing, walking, or sitting, (id. at 272).

Moreover, the disputed statement was only one of several reasons the ALJ provided to support her determination relating to Davis's left-leg weakness. *See Wilson v. Colvin*, No. 14 CV 1240, 2015 WL 2260530, at *12 (S.D. Ind. May 13, 2015) (noting that "even if the ALJ's consideration of Plaintiff's daily activities had

been erroneous, this error in the analysis of a single factor would not require remand" (emphasis omitted)).  The ALJ supplied other supporting reasons including Davis's denial of difficulty walking, medical records regarding her normal motor strength in her lower legs, and the lack of any medical record regarding Davis's treatment of her lower left leg.[1]  (A.R. 29.)  Accordingly, the ALJ's determination is not lacking in support or so poorly articulated as to prevent meaningful review or warrant a remand.  *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## B.     The Consultative Examiner's Evaluation

Davis argues that the ALJ failed to address consultative examiner Dr. Carlton's substantive findings and disregarded important evidence that supports Davis's leg weakness.  (R. 22, Pl.'s Mem. at 11-12.)  Once again, the ALJ did consider Dr. Carlton's consultative examination, but concluded that his opinion was entitled to little weight because she concluded that it was an overly conservative estimate of Davis's abilities.  (A.R. 31-32.)  An ALJ is not bound by any findings made by state agency medical consultants so long as she explains in the decision the weight given to those opinions based on the relevant rules and factors.

---

[1]  Davis also argues that the ALJ failed to address corroborating evidence relating to Regina Williams's allegation of Davis's "lack of balance."  (R. 22, Pl.'s Mem. at 12; R. 28, Pl.'s Reply at 3.)  However, the ALJ need not mention every piece of evidence, *Denton*, 596 F.3d at 425, and the ALJ provided reasons for determining that Davis does not suffer from lower-leg weakness and standing limitations, (A.R. 29, 31).  Moreover, a lay opinion is not competent to refute professional medical testimony or establish the existence of an impairment as a layperson is not an "acceptable medical source."  *See Arnold v. Barnhart*, 473 F.3d 816, 821-22 (7th Cir. 2007).  Because the ALJ provided detailed explanations as to why she discredited Davis's subjective complaints regarding her left-leg weakness, standing tolerance, and cane use, the court finds harmless the ALJ's failure to discuss in her decision Williams's lay testimony concerning Davis's balance.  (A.R. 29-31.)

20 C.F.R. § 416.927(e)(2).  Further, the RFC is an assessment of the maximum work related activities the claimant can perform despite her limitations.  *See Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1).  Here, the ALJ assessed Dr. Carlton's examination findings and explained why she gave them little weight, including the fact that under the relevant regulations the RFC is the most that an individual can do.  (A.R. 31-32.)  If, on the other hand, Davis intended to challenge the ALJ's decision to afford Dr. Carlton's opinion little weight, Davis failed to develop that argument in her briefs.[2]  (R. 22, Pl.'s Mem. at 11-12; R. 28, Pl.'s Reply at 4-5.)

Davis also raises a concern in her reply brief that the ALJ "played doctor" by rejecting medical consultant Dr. Vincent's opinion regarding her ability to reach with the left extremity.  (R. 28, Pl.'s Reply at 5.)  Putting aside the rule that arguments raised for the first time in reply briefs are waived, *see Frey v. E.P.A.*, 751 F.3d 461, 466 n.2 (7th Cir. 2014), the court acknowledges that ALJs "must not succumb to the temptation to play doctor and make their own independent findings," *see Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).  However, an ALJ only impermissibly plays doctor when she either rejects a doctor's medical conclusion without other evidence, *see Dixon*, 270 F.3d at 1177, or when she draws medical conclusions about a claimant without relying on medical evidence, but

---

[2]  Davis's argument with respect to Dr. Vincent's opinion addresses whether the ALJ played doctor, but as explained above, she does not challenge the ALJ's weighing of Dr. Vincent's opinion pursuant to the regulatory factors. Likewise, Davis fails to develop an argument regarding the ALJ's weighing of medical opinions with respect to Davis's ability to reach with her left arm. (A.R. 31.)

rather on her intuition, *Moon v. Colvin,* 763 F.3d 718, 722 (7th Cir. 2014). Neither situation exists here because the ALJ considered and relied on other medical evidence, including Dr. Carlton's examination results. (A.R. 28-29, 30, 32.) Notably, the ALJ explained in her decision that she found Dr. Vincent's opinion regarding Davis's ability to reach with her left upper extremity not supported in view of other evidence of record demonstrating Davis's "4/5 motor strength in the left shoulder and left elbow with normal range of motion." (Id. at 30-31.) The role of this court is to review the record to ensure that the ALJ's decision is based on substantial evidence, but in the absence of legal error, the court will not substitute its own judgment or reweigh the evidence. *See Flener*, 361 F.3d at 447. Here, the ALJ does provide a requisite "logical bridge" between the evidence and her conclusion based on her weighing of different medical opinions. *See Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002).

## C. Combination of Impairments

Lastly, Davis contends that the ALJ erred in failing to consider Davis's obesity in combination with leg weakness to assess for any additional limitations in crafting her RFC. (R. 22, Pl.'s Mem. at 12.) When a claimant alleges a number of impairments, the ALJ must consider "the *aggregate* effects of the entire constellation of impairments." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (emphasis in original). It is well established in the Seventh Circuit that the ALJ needs to consider the applicant's medical situation as a whole, including obesity. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (citations omitted).

Even if each problem assessed separately were less serious, their combination might well be totally disabling. *Martinez v. Astrue*, 630 F.3d 693, 697-98 (7th Cir 2011).

Here, Davis maintains that the ALJ did not discuss Davis's obesity in combination with chronic leg weakness or assess how it might have contributed to her falls or difficulty in standing. (R. 22, Pl.'s Mem. at 12.) Contrary to Davis's assertion, however, the ALJ specifically determined that Davis's impairments did not include her purported left-leg weakness. (A.R. 29.) Accordingly, the ALJ had no reason to consider Davis's obesity in combination with left-leg weakness. Nevertheless, the ALJ emphasized that she had considered all pertinent impairments in combination and explained that "[o]verall, I find that the claimant's [RFC] is reduced due to the combination of the claimant's obesity, hypertension, and status post [CVA]." (Id.) She underscored in particular that "[i]n limiting the claimant to a range of light work, I have also considered her obesity." (Id. at 30.) The ALJ concluded that "[i]n reaching my RFC findings, I have considered all of the claimant's impairments, both individually and in combination." (Id. at 32.) In all of these ways, the ALJ's decision assures the court that she considered Davis's obesity in combination with her other impairments but concluded that it did not warrant greater limitations than those set out in her RFC assessment. *See Lott v. Colvin*, 541 Fed. App'x. 702, 706 (7th Cir. 2013) (noting that "we only require that the ALJ acknowledge having considered the aggregate effect, as long as the ALJ discusses each symptom"). Because the ALJ's decision is free of legal error and supported by

substantial evidence, this court must affirm the agency's decision. *See* 42 U.S.C. § 405(g); *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).[3]

## Conclusion

For the foregoing reasons, Davis's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**

---

[3] Because the court finds the ALJ's RFC determination properly supported, it need not address Davis's argument that insufficient jobs are available in the national economy for an individual limited to sedentary work without bilateral dexterity.